Leblanc *v.* Friedman.

ROLAND A. LEBLANC & another[1] *vs.* ANDREW J. FRIEDMAN.

Middlesex. October 10, 2002. - January 29, 2003.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Release. Mistake. Negligence,* Medical malpractice. *Practice, Civil,* Summary judgment.

In an action for medical malpractice in which the plaintiff had executed a release, holding the defendant harmless for all known and unknown injuries arising out of the "care and treatment rendered to [the plaintiff] on or about March 16, 1992," the judge incorrectly granted a motion for summary judgment for the defendant, where, although the plaintiff alleges that the defendant's negligence of March 16 caused or contributed to her injury, there were disputed issues of material fact whether that injury resulted solely from the care and treatment provided on March 16, 1992, or whether other negligent failures on other dates, which were not covered by the release, were also a proximate cause of the injury. [596-600] COWIN, J., with whom SOSMAN, J., joined, dissenting.

CIVIL ACTION commenced in the Superior Court Department on May 20, 1997.

The case was heard by *Charles T. Spurlock,* J., on a motion for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Carol A. Kelly* for the defendant.

*Barry D. Lang* for the plaintiffs.

*Steven L. Schreckinger & Anne Robbins,* for Risk Management Foundation of the Harvard Medical Institutions, Inc., amicus curiae, submitted a brief.

CORDY, J. This medical malpractice case turns on the interpretation of a release signed by the plaintiffs Diane and Roland Leblanc after it was discovered that a medical instrument had been left in Mrs. Leblanc's abdomen by the defendant Dr. Andrew J.

[1]Diane J. Leblanc.

Friedman during a surgical procedure. The Leblancs later sued Dr. Friedman for injuries resulting from acts of malpractice unrelated to the medical instrument. The motion judge granted Dr. Friedman's motion for summary judgment, holding that the broadly worded release covered the malpractice that the Leblancs alleged. The Appeals Court reversed, reasoning that because the parties had not anticipated the injury that was the subject of the malpractice claim, the release may have been the product of a mutual mistake, which would be dependent upon the intent of the parties, a genuine factual issue in dispute. *Leblanc* v. *Friedman*, 53 Mass. App. Ct. 697 (2002). This court granted the defendant's application for further appellate review. We agree with the Appeals Court that summary judgment was inappropriate in this case, but for different reasons.

1. *Background.* The facts of this case are largely undisputed. On June 28, 1991, Diane Leblanc, then under the care of Dr. Raymond Partridge, underwent an ultrasound after complaining of pelvic pain. The ultrasound determined that Mrs. Leblanc's left ovary was approximately one-half the size of her right one. It also detected indications of endometriosis. Mrs. Leblanc was diagnosed with endometriosis and was eventually referred to Dr. Friedman for treatment. On March 16, 1992, Dr. Friedman performed a laparoscopy (an internal pelvic-abdominal examination) on Mrs. Leblanc. The laparoscopy confirmed the endometriosis; Dr. Friedman, however, failed to detect Mrs. Leblanc's left ovary during that examination and concluded that the left ovary was absent.[2]

The day after the laparoscopy, Mrs. Leblanc complained of pelvic pain and discomfort. After she discharged a piece of a medical instrument, Mr. Leblanc contacted Dr. Friedman's office. On April 2, 1992, the couple visited Dr. Friedman's office for a follow-up appointment. Dr. Friedman apologized for the medical instrument, which had apparently been retained in Mrs. Leblanc's abdomen during the procedure. He and the couple discussed the options for treating her endometriosis; all agreed that she should begin receiving injections immediately. Dr. Friedman also told Mrs. Leblanc that she had been born with only one ovary.

---

[2]The Leblancs contend that Dr. Friedman did not consult the 1991 ultrasound before coming to his conclusion.

At the next appointment, on April 30, the couple decided, after consultation with Dr. Friedman, that Mrs. Leblanc should undergo a hysterectomy. Dr. Friedman performed the procedure on June 3, 1992, removing only the right ovary and failing to notice or remove the left ovary.

At some point between March and August, 1992, the Leblancs were contacted by Richard Healy of the Risk Management Foundation of the Harvard Medical Institutions (foundation). The foundation serves as the claims adjuster for the company that provides malpractice liability insurance for hospitals affiliated with Harvard Medical School.[3] Healy told the Leblancs that the foundation was interested in settling any possible claims that the Leblancs might have or bring regarding the medical instrument left in Mrs. Leblanc after the laparoscopy. On August 17, 1992, after both the laparoscopy of March 16 and the hysterectomy of June 3, the foundation's initiative resulted in the Leblancs executing, for $7,000 consideration, the release that is the centerpiece of the defendant's summary judgment motion.

The release discharges four individuals or entities from liability: Dr. Friedman; another doctor also involved in the laparoscopy; Brigham and Women's Hospital; and Richard Wolf Medical Instruments Corp., the maker of the instrument left inside Mrs. Leblanc (four parties). It does not specifically reference the medical instrument or its having been left in Mrs. Leblanc during the laparoscopy procedure, but does refer to the care and treatment she received on March 16. Because the text of the release is critical to our analysis, the foundation of this case, it deserves to be quoted at length:

> "[The Leblancs] discharge [the four parties] of and from all debts, demands, actions, causes of actions, suits, accounts, covenants, contracts, agreements, damages of any and all claims, demands and liabilities whatsoever, of every name and nature, which we now have or might have, upon or against said [four parties] *more especially from all claims arising out of any and all personal injuries, damages, expenses and any loss or damage whatsoever result-*

---

[3]Dr. Friedman worked at Brigham and Women's Hospital, which is affiliated with Harvard.

*ing from care and treatment rendered to Diane Leblanc on or about March 16, 1992 . . . .*

"[The Leblancs further hold the four parties harmless] from all claims, demands and suits for damages, costs, loss of services, loss of consortium, companionship, society or affection, expenses or compensation, which [they] . . . have or may have on account of, or in anyway growing out of, *said care and treatment* or its results.

"It is agreed and understood by the undersigned that this Release runs not only to [the four parties] but, in addition, to [any other parties] who are or might otherwise be liable in anyway for *the care and treatment rendered to the undersigned and which is the subject matter of this settlement . . . .*

"[They] further understand that this Release is to compromise and terminate all claims for *injuries* and/or damages of whatever nature, known or *unknown,* including future developments thereof *in anyway growing out of or connected with* or which may hereafter in anyway grow out of or be connected with *said care and treatment* [or] its results . . . .

" 'It is the intention of both parties hereto that this Release shall resolve any and all claims of any kind [or] nature which [we] have against [the four parties], including specifically, without limiting the generality of the foregoing, claims for injuries currently existing but unknown to either or both of the parties hereto.' " (Emphases added. Indentation and spacing in the original.)

During a trip in the spring, 1994, Mrs. Leblanc again began to feel pain, such that she was taken to an emergency room in Oklahoma. When X-rays suggested a possible tumor, she consulted a urologist on the advice of Dr. Partridge. Further tests revealed that Mrs. Leblanc did in fact have a left ovary. It was later surgically removed.

The Leblancs subsequently brought the present suit charging Dr. Friedman with malpractice for failing to verify the existence of Mrs. Leblanc's left ovary during the March 16, 1992, lap-

aroscopy, and failing to remove it during the June 3, 1992, hysterectomy. Mrs. Leblanc further alleged that Dr. Friedman's negligence had caused the pain she experienced in 1994, among other damages.[4] The judge granted summary judgment for Dr. Friedman. The judge reasoned that the release, by its explicit terms, discharged Dr. Friedman from all liability for negligent acts he had committed before August 17, 1992, including the negligence of failing to detect and subsequently failing to remove Mrs. Leblanc's left ovary.

The Appeals Court reversed the decision. 53 Mass. App. Ct. 697 (2002). Relying on *LaFleur* v. *C.C. Pierce Co.*, 398 Mass. 254 (1986), the court held that the release did not bar the present claim if the parties had made a mutual mistake of fact in not realizing that the left ovary existed, and thus had intended that the release apply only to injuries caused by the medical instrument. Given that the instrument manufacturer and a doctor assisting in the laparoscopy had been named as parties to the release and that the foundation had represented to the Leblancs that the release was intended to pertain to the instrument incident, the court concluded that there existed a disputed issue of material fact as to whether the parties had intended that the release cover Dr. Friedman's negligent failure to detect and remove the left ovary. The court was reassured in its position by the relatively small sum of money paid to the Leblancs for the release and the fact that the couple did not consult an attorney before signing it. This court granted further appellate review.

2. *Discussion.* An order granting summary judgment will be upheld if "the judge ruled on undisputed material facts and those rulings were correct as a matter of law." *Aldrich* v. *ADD Inc.*, 437 Mass. 213, 218 n.9 (2002).

The central issue in this summary judgment motion is a mixed question of law and fact: whether any of the injuries alleged by the Leblancs fall outside the scope of the August 17, 1992, release discharging Dr. Friedman's liability. Because the interpretation of a contract is a question of law for the courts, *Lumber Mut. Ins. Co.* v. *Zoltek Corp.*, 419 Mass. 704, 707 (1995), and releases are a form of contract, see *Sharon* v. *Newton*, 437 Mass. 99, 105

---

[4] Mr. Leblanc sued for loss of his wife's consortium.

(2002), the question has a legal element: What acts does the release cover? If there are facts material to this mixed question in dispute, summary judgment cannot be granted.

The Appeals Court believed that there were material facts in dispute, and based this belief on our holding in *LaFleur* v. *C.C. Pierce Co.*, *supra*. In *LaFleur*, the plaintiff was injured when a forklift blade fell on his toe, spraining it and also, unbeknownst to anyone, aggravating a latent arterial disease from which he suffered. LaFleur settled with his employer and signed a release that made no mention of whether it covered "unknown" injuries. He later discovered the disease and sued. This court first held that because the release was ambiguous, "the intention of the parties [was] controlling," *id.* at 260. It then went on to hold that there was a material question of fact as to "whether there has. been a conscious and deliberate intention by the parties to release claims for injuries existing but not known to them at the time of the agreement," *id.*, and that extrinsic evidence on the subject could be introduced to ascertain the parties' intent. Because the intentions of the parties were decisive in that case, the dispute regarding those intentions was material and the case was properly remanded for trial.

The intentions of the parties here are not similarly in dispute. Unlike the release at issue in *LaFleur*, the release signed by the Leblancs contained a provision discharging the four parties from liability for injuries both "known or unknown" at the time of signing, and specifically recited their intention that the release includes "injuries currently existing but unknown to either or both of the parties." Because the release provided for such coverage, the subjective beliefs of the parties as to whether the release covered unknown injuries is thus irrelevant.[5] This does not, however, end our inquiry into the pivotal issue in this case: whether the release covered all "unknown" injuries which may have resulted from any care provided to Mrs. Leblanc before it was signed on August 17, or just those "unknown" injuries associated with the medical instrument incident.

Dr. Friedman claims that the release is a general release, which this court has held "is 'to be given effect, even if the

---

[5] The Leblancs do not contend that the release was unconscionable. See, e.g., Restatement (Second) of Contracts § 152 comment f at 390-391 (1981).

parties did not have in mind all the wrongs which existed at the time of the release.' " *Schuster* v. *Baskin*, 354 Mass. 137, 140 (1968), quoting *Naukeag Inn, Inc.* v. *Rideout*, 351 Mass. 353, 356 (1966). General releases dispose "of all claims and demands arising out of *any* transactions between" the parties (emphasis added). *Schuster* v. *Baskin*, *supra*. If the August 17 release was general, then, it would relieve Dr. Friedman of liability for any later discovered negligence.

Massachusetts cases interpreting general releases have encountered documents breathtaking in their scope. In *Naukeag Inn, Inc.* v. *Rideout*, *supra* at 355, for example, one party released all claims which "I [*sic*] may hereafter have from anything which has heretofore happened." In *Atlas Tack Corp.* v. *Crosby*, 41 Mass. App. Ct. 429, 431 (1996), the plaintiff discharged the defendant "from all manner of actions, causes of action . . . which [the plaintiff] ever had, now has or which it or its successors can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents."

While the release in this case contains some of the same language, referring repeatedly to "all claims" that the LeBlancs might have had, it also contains limiting language. Every paragraph of the document is qualified such that it relates back to a phrase in the first paragraph — that released the four parties "from all claims . . . resulting from *care and treatment rendered to Diane LeBlanc on or about March 16, 1992*" (emphasis added). Paragraph two refers to any claims "on account of, or in anyway growing out of, *said care and treatment* or its results" (emphasis added). Paragraph three pertains to claims against other parties "who are or might otherwise be liable in anyway for *the care and treatment rendered to the undersigned and which is the subject matter of this settlement*" (emphasis added). Most importantly, paragraph four, which discharges the four parties from liability for claims for "unknown" injuries, does so for such claims which "may hereafter in anyway grow out of or be connected with *said care and treatment* [or] its results" (emphasis

added).[6] In light of this limiting language, we interpret the release to discharge the liability of the four parties for "unknown" injuries only to the extent that such injuries in "any way grow out of" or are "connected with" the care and treatment that Mrs. Leblanc received on March 16, 1992, the only "care and treatment" referenced in the release.

The Leblancs are suing Dr. Friedman for his negligence in not discovering and removing her left ovary. One instance of that alleged negligence was his failure to view it during the March 16 laparoscopy. As we have just held, the release prevents the LeBlancs from holding Dr. Friedman liable for injuries resulting from that act. On the Leblancs' view, however, Dr. Friedman's negligence is not limited to his actions on that date. The complaint alleges two acts of negligence, the first being the failure to identify the left ovary during the March 16, 1992, procedure, and the second being the failure to observe and remove that ovary during the hysterectomy on June 3, 1992. The opinion of the plaintiffs' expert, Dr. Richard H. Warburton, which was included in the summary judgment materials, was that, "in spite of the fact that at the laparoscopy in March of 1992 no left ovary was seen, probably because of endometriosis and adhesions . . . the ovary should have been identified at the time of her surgery in June of 1992, when she had her hysterectomy." In addition, as the Leblancs' counsel emphasized to the judge during the summary judgment argument:

[6]Paragraph four ends with a blocked quotation attributed to the parties. It begins with the phrase, "It is the intention of both parties hereto . . . ." Most importantly, its topic, extending the release to existing but unknown injuries, is the same as the topic of the rest of the paragraph. From these indicia, we conclude that it is meant simply to emphasize the point in quoted words, that the release covers all injuries, whether they are detected or not, arising out of the care and treatment referred to earlier in the paragraph (and in all the other paragraphs as well). To the extent that the language used and its sequencing may be seen as ambiguous on this point, we would construe it "strongly against the party who drew it." *Bowser* v. *Chalifour*, 334 Mass. 348, 352 (1956). While there has been no specific evidence presented as to who actually drafted the release, it is undisputed that it was the foundation that presented it to the Leblancs (who were unrepresented by an attorney) for signature, and that it was signed as presented. In such a case, we can reasonably infer that the foundation, as insurer and acting on behalf of the defendant, was responsible for preparing or directing the preparation of the draft.

"[W]hat we're also claiming is that subsequent to the [March 16] procedure, when he thought or assumed that there was no ovary, he should have, in accordance with the standard of good medical practice, done further testing to determine whether or not there was in fact an ovary present. He could have done that by doing an ultrasound exam, which, by the way, had been done — performed in the year 1991, and which showed two ovaries.

"Now, Dr. Friedman was also negligent in our allegation because he didn't refer to that prior ultrasound. So that's a separate and distinct act from March 16.

"Also, subsequent to March 16, he did not follow up and take hormonal tests which would have ruled out whether or not there was in fact another ovary present. That was negligent.

"When he did the hysterectomy, he again did not discover the ovary, and that, again, was a separate, distinct negligent act. It had nothing to do with the March 16 incident."

While the Leblancs do allege that Dr. Friedman's negligence of March 16 caused or contributed to Mrs. Leblanc's injury, there are disputed issues of material fact as to whether that injury resulted solely from the care and treatment provided on March 16, 1992, or whether other negligent failures to detect and remove the ovary were also a proximate cause of the injury. Care and treatment provided on other dates are not covered by the release, and the Leblancs' complaint may therefore still be actionable. The judge's order granting summary judgment was thus inappropriate.

The order of the judge is vacated and the case remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

COWIN, J. (dissenting, with whom SOSMAN, J., joins). The court erroneously concludes that, because the release at issue in this case makes several references to a specific instance of care, the scope of that release must consequently be limited to claims

stemming from that instance of care. The court thus mistakes specific language for limiting language. In fact, general releases normally include a number of provisions specifically releasing particular claims, see, e.g., *Sahli* v. *Bull HN Info. Sys., Inc.,* 437 Mass. 696, 697 n.3 (2002) (general release including specific release of discrimination based claims); *Tupper* v. *Hancock,* 319 Mass. 105, 106 n.1 (1946) (general release including specific release of claims stemming from particular act); *Atlas Tack Corp.* v. *DiMasi,* 37 Mass. App. Ct. 66, 67 n.3 (1994) (same), and standard form contract compilations often include model general releases formatted similarly to the one at issue here. See, e.g., Nichols Cyclopedia of Legal Forms Annotated § 4.2686 (2002) (general release form incorporating ten specific releases); 2C West's Federal Forms, District Courts — Civil § 2817 (4th ed. Supp. 2002) (general release form with provision for specifying particular claims). The mere addition of specifics, therefore, does not automatically transform a general release into a limited release.

This document is, in fact, a release as "breathtaking in [its] scope," *ante* at 598, as the drafters could possibly make it. The release's main clause provides:

> "[W]e, the undersigned do hereby jointly and severally for ourselves and each of our heirs, executors, administrators and assigns, remise, *release and forever discharge* the said Brigham & Women's Hospital, Elizabeth Stewart, M.D., Andrew Freidman [*sic*], M.D. and Richard Wolf Medical Instruments Corp. of and *from all debts, demands, actions, causes of actions, suits, accounts, covenants, contracts, agreements, damages of any and all claims, demands and liabilities whatsoever, of every name and nature, which we now have or might have,* upon or against said Brigham & Women's Hospital, Elizabeth Stewart, M.D., Andrew Friedman, M.D. and Richard Wolf Medical Instruments Corp. *more especially* from all claims arising out of any and all personal injuries, damages, expenses and any loss or damage whatsoever resulting from care and treatment rendered to Diane Leblanc on or about March 16, 1992 by Andrew Freidman [*sic*], M.D. and Elizabeth Stewart, M.D." (emphasis added)

This language, by its plain meaning, disposes " 'of all claims

and demands arising out of any transactions between' the parties." *Schuster* v. *Baskin*, 354 Mass. 137, 140 (1968). It is, in other words, a general release. *Id*. Any exceptions to such a general release must be specifically detailed in the release itself to remain valid. *Id*. at 140-141. While this release goes on (at great length) to highlight certain included claims, it makes no exceptions. *All* the plaintiffs' claims against the defendant are therefore discharged.

The text following the phrase "more especially" does nothing to alter this fact. The phrase "more especially" means, in this context, "including, but not limited to," and is often used within a general release to highlight the particular incident or claim that gave rise to the parties' dispute. See *Spritz* v. *Lishner*, 355 Mass. 162, 163 (1969); *Tupper* v. *Hancock, supra* at 105, 106-108 & n.1; *Glendale Coal Co.* v. *Nesson*, 312 Mass. 293, 294 (1942). Such specific references do not limit the scope of the general releases that contain them.

Even if the release's opening section left any doubt as to its intended breadth, the final section of the document makes the parties' intentions transparent. It states: "It is the intention of both parties hereto that this Release shall resolve any and all claims of any kind [or] nature which [we] have against [the four parties], including specifically, without limiting the generality of the foregoing, claims for injuries currently existing but unknown to either or both of the parties hereto." This text, which makes no reference to any particular incident of care, dispels any possibility that the release was intended to be limited in scope.[1]

The language of the release leaves the plaintiffs without a valid claim. The court, in order to avoid what it apparently

[1] The court dismisses this passage as ambiguous and, applying the rule of construction mandating that ambiguous terms be interpreted against the drafter, interprets it to be a meaningless reiteration of the preceding paragraph. Although the meaning of the release's concluding sentence is clear to me, even if one were to find it ambiguous, the court's application of the rule requiring interpretation against the drafter would still be incorrect. A prerequisite to the application of that interpretive rule is that the resulting construction be both reasonable and practical, *see Shea* v. *Bay State Gas Co.*, 383 Mass 218, 225 (1981), and "it is neither reasonable nor practical to interpret [a] clause as being meaningless." *Id*. See *Fishman* v. *LaSalle Nat'l Bank*, 247 F.3d 300, 302 (1st Cir. 2001) ("Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons").

perceives as a harsh result, reads limits into a release that contains none. This is an example of a hard case making bad law. I must, therefore, respectfully dissent.