Hinkle, Margaret R., J.
Plaintiff Kathryn Diamond (“Diamond"), a minority shareholder in a close corporation, filed this action against the defendants alleging fraud and breach of fiduciary duty in connection with the defendants’ acquisition of the corporation’s subsidiary. This matter is before the court on the defendants’ motion for summary judgment on all counts of the complaint. For the reasons discussed below, the defendants’ motion is allowed.
BACKGROUND
Viewed in the light most favorable to the plaintiff as the non-moving party, the undisputed facts as revealed by the summary judgment record are as follows. Scangas Brothers Holdings, Inc. (“SBHI”) had a small number of shareholders, all of whom were members of the Scangas family, and there was no ready market for its shares of stock. Defendants Arthur Pappathanasi (“Pappathanasi”), Nicholas Scangas (“Nick”), and Christopher Scangas (“Chris”) were the *501 officers and directors of SBHI and conducted its day-to-day operations. Nick and Chris are brothers, and the other shareholders of SBHI included their sisters, Patricia Scangas and Pamela Scangas; their brother, Arthur Scangas; and their cousins, Diamond and her sister Joan Whelan (“Whelan”), Pappathanasi, Janice Scangas, and Joyce Scangas.
SBHI was engaged in the acquisition, management and sale of commercial real estate in Essex County, and owned and operated West Lynn Creamery in Lynn (“the Creamery”). SBHI also had a wholly-owned subsidiary, Richdale Dairy Stores, Inc. (“Richdale”), a chain of convenience stores. Albino DiJanni (“DiJ-anni”), the Chief Operating Officer of Richdale, was responsible for determining why Richdale was not making money. One of DiJanni’s priorities was to sell or close a large number of stores which had no profitable future despite receiving dairy products from the Creamery at well below market cost. Most of the Richdale stores were old and not competitive with the 7-Eleven stores dominating the market, and many were in poor locations with parking or lease issues. Between 1991 and 1997, DiJanni eliminated many of the worst performing stores, several of which were sold to Richdale store managers. However, Richdale was still losing money.
In April of 1996, Pappathanasi, as President and CEO of the Creamery, engaged Tucker Capital Corporation to find a buyer for the Creamery but not affiliated entities such as Richdale and the Scangas real estate partnerships. In August of 1996, Hood made an offer for the Creamery which included a right of first refusal on the Richdale stores, but Pappathanasi rejected Hood’s proposal because he thought the price offered was much too low. In 1997, Suiza Foods Corporation, which owns Garelick Farms (“Garelick”), expressed interest in purchasing the Creamery but told Pappathanasi that it was not interested in Richdale because Garelick supplied all of Richdale’s competitors with dairy products; it had no desire to enter into the convenience store business, and many of the Richdale stores had environmental liability issues from old gas pumps. On October 8, 1997, Diamond, Joyce Scangas, Janice Scangas, and Whelan retained Sumner Kaufman (“Kaufman”) to advise them with respect to the possible sale of their minority SBHI shares to outsiders. In December of 1997, Joyce and Janice Scangas were bought out of the Scangas real estate partnerships, but Diamond refused to be bought out.
On December 19, 1997, Garelick executed a Memorandum of Intent to purchase all the stock of SBHI for $40,000,000 on the condition that Richdale be sold or spun off to the SBHI stockholders and its value deducted from the price to be paid for SBHI. At some point, Garelick assigned a value of $3,000,000 to the Richdale chain and stated that it would reduce the purchase price for the Creamery by that amount. Diamond’s husband, Basil, who is an attorney, prepared a list of potential minority stockholder issues related to the sale of SBHI and sent it to the other minority stockholders, including Janice and Joyce Scangas and Whelan. Diamond, Basil, Whelan and Janice Scangas met for drinks at the Four Seasons on January 6, 1998 to discuss minority stockholder issues.
On January 7, 1998, the SBHI stockholders met to discuss the possible sale of the company and to review the information in the Memorandum of Intent. Diamond attended, as did her attorney Anthony Doniger (“Doniger”). Most of the other minority shareholders also had their attorneys present. Pappathanasi refused to provide any documentation at the meeting or permit anyone to take notes or record the meeting because he did not want any information about the potential sale to Garelick to be leaked to the public. Pappathanasi explained that Garelick demanded that Richdale be sold or spun off, stated that Richdale was “struggling,” and opined that Richdale’s future was not good because it lacked the resources to compete with gas stations and pharmacies for new locations. Pappathanasi stated that the shareholders were stuck with Richdale and that Richdale was a losing business and more trouble than it was worth. Pappathanasi noted that Garelick had placed a value of $3 million on Richdale but opined that Richdale was probably not worth that much, but was worth closer to $2 million. Nick and Chris made comments supporting Pappathanasi’s statements concerning the value of Richdale. Pappathanasi stated that if they could not sell Richdale before the sale to Garelick, Richdale would be spun off and all the shareholders would have an opportunity to participate. He further stated that after the spin-off, he hoped to sell the chain immediately for whatever he could get for it. Pappathanasi stated that if any shareholder was interested in the spin-off, he would provide more information. Pappathanasi did not disclose that the Richdale stores possessed a going concern value above their book value. Pappathanasi asserted that Garelick was unlikely to pay any inter-company debts and that such debts would be written off.[2] There was much discussion by the minority shareholders and their attorneys about the particularly favorable terms Pappathanasi, Nick, and Chris would receive in the transaction. No decisions were made at this meeting, but the shareholders were asked to think about whether they wanted the sale to proceed in accordance with the Memorandum of Intent.
The SBHI shareholders held another meeting on Januaiy 15, 1998. Pappathanasi told the other shareholders that each had the opportunity to participate in a $3 million spin-off of Richdale in accordance with their percentage of ownership of SBHI. Diamond did not attend this meeting, but her attorney did. Diamond had instructed Attorney Doniger to vote in favor *502 of the sale, although she wanted to reserve her right to address the excessive benefits to Pappathanasi, Nick and Chris after the sale. The attorneys for Joyce and Janice Scangas objected to the employment agreement and other aspects of the Memorandum oflntent, but Pappathanasi, Nick and Chris stated that those terms were non-negotiable. A few days after the January 15 meeting, Diamond learned that the deal with Garelick was “dead.”
On January 29, 1998, Attorney Doniger sent a letter on Diamond’s behalf to Pappathanasi as President of SBHI, demanding that the board of directors redress several alleged corporate wrongs committed by controlling SBHI officers and directors, including alleged breaches of fiduciary duty from carrying on “secret” negotiations with Garelick concerning the sale of the Creamery and Richdale, self-dealing in those negotiations, and seeking to coerce objecting minority shareholders to consent to the sale. The letter specifically alleged:
Starting sometime in mid-1997 and continuing through today, Management carried on secret negotiations with [Garelick] for the purchase of the subsidiaries of SBHI, West Lynn Creamery, Inc. and West Lynn Creamery Realty, Inc. and a simultaneous sale of the remaining subsidiary of SBHI, Richdale Dairy Stores, Inc. to another third party . . . Management used corporate legal counsel . . . to assist the negotiation of not only a purchase and sale of these subsidiaries but also extraordinary valuable employment agreements and non-competition agreements for some of their members, which constituted a breach of fiduciary duties owned by corporation counsel to the minority shareholders . . . Through incomplete disclosure and various artifices, Management . . . through [corporate counsel], attempted to coerce objecting minority stockholders to consent to the sale/merger with the self dealing, beneficial agreements for themselves.
At some point in 1998, Pappathanasi informed DiJanni that he was negotiating the sale of the Creamery but that Richdale would have be sold separately. SBHI hoped to sell all the Richdale locations to a national convenience store chain and spoke privately to individuals at Christy’s Markets, Lil’ Peach, Store 24, Irving, 7-Eleven, White Hen and several other chains. However, the best offer received was $1.7 million for 40 plus stores, which Pappathanasi rejected.
On March 23, 1998, the SBHI Board of Directors held a special meeting to discuss the need to downsize Richdale by selling about 20 of the stores in order to raise cash. Basil attended this meeting on behalf of Diamond. When he inquired as to which stores would be sold, he was told that it had not yet been determined. Attorney Doniger sent a letter requesting information about which Richdale stores might be sold, the identity of the prospective purchasers, and the terms and conditions of any sale. SBHI attorney Michael Altman responded to this letter. At some point after the meeting, Diamond requested information from Attorney Altman, who responded that she was not entitled to such information because she was not a director.
The potential sale of SBHI to Garelick was revived. Pappathanasi did not explain the specific business terms of the spin-off to the other shareholders because he believed that the shareholders knew Richdale’s status from the annual meetings. If Diamond requested any information about the spin-off from Pappathanasi, he would have provided the information to her attorney. Kaufman does not recall receiving any financial statements or other documents from Pappathanasi regarding the Richdale spin-off.
On April 2, 1998, Basil sent Chris a letter demanding $525,000 for the settlement of Diamond’s outstanding claims. The next day, Diamond revised her demand to $650,000 for the settlement and the exchange of mutual releases with SBHI, Pappathanasi, Nick, and Chris. Attorney Doniger represented Diamond in negotiating a deal in which Diamond and the other minority shareholders would allow Pappathanasi, Nick, and Chris to purchase their SBHI shares and then sell SBHI to Garelick. Diamond was offered the opportunity to purchase 12.5% of Richdale but instructed Doniger that she did not wish to participate in the Richdale spin-off.
On May 1, 1998, Diamond executed an Option Agreement with Pappathanasi, Nick, and Chris as grantees which stated in part:
The Grantor hereby grants the Grantees the unconditional right and option (“Option”) to purchase all of her right, title and interest in and to all of the common stock of. . . SBHI owned by her ... In the event that the shares of [Richdale) are spun off to the SBHI shareholders prior to the closing of the Grantee’s acquisition of Grantor’s SBHI shares . . . then the Option being granted herein shall include all Richdale shares owned by the Grantor for no additional consideration, provided that Garelick shall pay all of the federal and state income taxes incurred by Grantor in connection with the spin off of the Richdale shares.
Paragraph 10 of Diamond’s Option Agreement contained the following unique provision:
Settlement In consideration for the payment of Six Hundred Fifty Thousand Dollars (“650,000”), which shall be paid at the same time as the payment of the Option Price, Kathryn Diamond hereby agrees that she shall deliver to SBHI. . . and all of the Grantees a release, and any and all other agreements, instruments and documents as may be necessary or appropriate in order to release all claims which could have been made by Kathryn Diamond against any or all of the grantees, SBHI, its subsidiaries, and any other Scangas family partnership.
*503 Diamond executed a Release, which states in relevant part:
In consideration of value received by Kathryn Diamond (“Kathryn”), Kathryn Diamond hereby remises, releases, and forever discharges Arthur Pappathanasi, Nicolas Scangas, Christopher Scangas, Scangas Brothers Holdings, Inc. (“SBHI”), ... its officers, directors, shareholders, agents, attorneys, employees, subsidiaries and affiliates (collectively, the “SBHI Released Parties”)... of and from all debts, demands, actions, causes of action, suits, accounts, . . . damages, and any and all claims, demands and liabilities whatsoever of every name and nature, both a [sic] Law and in Equity, known and unknown, which against the SBHI Released Parties, or any of them, Kathryn now has or ever had from the beginning of this world to this date specifically, and only, but completely, with respect to (i) any and all claims which were asserted or could be asserted in connection with that certain transaction involving the sale of SBHI stock to Garelick Farms, Inc. or Suiza Foods Corporation (“the SBHI Stock Sale”), including but not limited to, claims of breach of fiduciary duly, (ii) any and all claims which were asserted or could be asserted in connection with any employment agreements and non-competition agreements executed by Arthur Pappathanasi, Nicholas Scangas, Christopher Scangas, and (iii) any and all claims which were asserted or could be asserted against any of the SBHI Released Parties in connection with any matter undertaken as a shareholder, officer or director of SBHI or any of its subsidiaries.
The Release is an exhibit to the Option Agreement, which states: “This Agreement, the Exhibits hereto and a letter agreement of even date embody the entire agreement of the parties and there are no oral or parol agreements, representations or inducements among the parties not expressly set forth herein.” Diamond discussed these documents with her attorney and her husband Basil before signing them.
On May 14, 1998, Richdale sold its Newburyport store to the store manager by accepting a promissory note for the full amount of the purchase price. On May 18, Richdale sold two of its New Hampshire stores to a Richdale manager under the same arrangement. On May 29, 1998, Garelick executed a new Memorandum of Intent setting forth terms including the spin-off of Richdale to Pappathanasi, Nick and Chris.
On June 5, 1998, SBHI attorney Michael Altman sent a letter to the attorneys for numerous shareholders, including Doniger, concerning the basic terms of the proposed sale to Garelick and the Richdale spinoff. On June 16, 1998, the SBHI shareholders held a meeting, which Basil attended, to discuss the impending sale to Garelick, including tax liability issues. On June 30, 1998, Pappathanasi, Nick, and Chris organized a new subsidiary of SBHI, Richdale Dairy Stores LLC (“Richdale LLC”). SBHI transferred all the assets of Richdale to Richdale LLC. The same day, Garelick acquired all of the shares of SBHI, and Pappathanasi, Nick, and Chris had $3,000,000 deducted from their share of the stock purchase in exchange for 100% of the ownership interest in Richdale LLC. Garelick paid $1,634,000 to Richdale LLC to satisfy inter-subsidiary debt owed to Richdale by West Lynn Creamery Realty Corp. and West Lynn Creamery, Inc. Pappathanasi, Nick, and Chris each received a $1.7 million premium in the transaction in exchange for entering into three-year employment contracts with Garelick and ten-year non-competition agreements. After the sale to Gar-elick, Pappathanasi worked in finance for Garelick: Chris ran the operation of the Creamery, and Nick was employed as the Vice President of Sales. However, after six months Garelick terminated all three men and filed suit against them, with a settlement eventually reached. On July 8, 1998, Diamond paid $75,114.98 to Kaufman for his consultation services.
Richdale LLC opened its balance sheet with liabilities significantly greater than the $3,000,000 equity investment made by Pappathanasi, Nick, and Chris. Richdale LLC assumed a $450,000 debt to the Estate of Angelo Scangas and two debts totaling $890,000 to Warren Savings Bank. By 2000, Richdale LLC had borrowed $600,000 from the Angelo Scangas Family Trust, $400,000 from Pappathanasi’s wife, and $150,000 from Nick’s wife to pay down its debt to the bank and cover its losses. Pappathanasi, Nick, and Chris also loaned Richdale LLC $1.9 million.
At some point in late 1998, DiJanni suggested to Pappathanasi that the best option would be to sell all the Richdale stores to long-term Richdale managers and supervisors. Richdale LLC set the price for each store, which was non-negotiable, and offered particular stores to particular individuals in a “take it or leave it” deal. Richdale LLC sold the stores with seller financing, taking secured notes from the purchasers with no payments due for the first six months. Because of the seller financing, Richdale LLC charged more for each store than it could have on the open market. DiJanni selected as buyers individuals whom he trusted to be good managers because he believed the remaining stores could eventually make money. Pappathanasi himself purchased three Richdale stores. In December of 1998, DiJanni purchased 13 Richdale stores from Richdale LLC for $3,950,000, including a core group of good money-makers and three stores that were not profitable but which Pappathanasi insisted he take as part of the deal. Pappathanasi agreed that if DiJanni lost the lease for those three stores, he would not be responsible for the promissory note on those stores. DiJanni closed one store in Beverly and one in Wenham almost immediately, and sold the rest of his stores within a two-year period, taking promissory notes from the buyers.
Richdale LLC currently does not operate any stores and merely holds and collects on the notes from the purchasers, secured by the Richdale stores. It has *504 written off some of the notes in connection with retaking stores on which the purchaser defaulted. In all instances in which it was forced to take back a store, Richdale LLC lost money on the resale of the store. Nonetheless, since 1998, Pappathanasi, Nick, and Chris have periodically received cash distributions from Richdale LLC. Ultimately, Richdale LLC has been a successful and profitable investment.
In 2004, Diamond filed a lawsuit alleging breach of contract, breach of fiduciary duly, and various other torts against Pappathanasi, Nick, Chris, and several other family members and entities. See Diamond v. Pappathanasi, Civil Action No. 2004-2886BLS1. In July of 2004, while reviewing discovery documents in connection with this lawsuit, Diamond saw records concerning Richdale LLC which led her to understand that the defendants had defrauded her in connection with the spin-off.
On May 14, 2007, Diamond filed this lawsuit against Pappathanasi, Nick, and Chris. Count I of the complaint alleges fraud based on misrepresentations and omissions by the defendants concerning the Richdale spin-off. Count II alleges negligent misrepresentation concerning the value of the Richdale spin-off. Count III alleges breach of fiduciary duty by the defendants, and Count IV seeks restitution based on a theory of unjust enrichment.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.RCiv.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
PLAINTIFF’S STANDING
The defendants first contend that they are entitled to judgment as a matter of law on the ground that Diamond lacks standing to bring this suit in an individual capacity because the claims in the complaint belong to SBHI, and thus may be asserted only in a derivative action. A shareholder may not bring a direct suit against a corporate wrongdoer if the only injury is a diminution in the corporation’s worth or other financial injury to the corporation. In such circumstances, the corporation is the injured party with the right to sue. Hurley v. Federal Deposit Ins. Corp., 719 F.Sup. 27, 30 (D.Mass. 1989). The wrong underlying a derivative action is indirect as to the shareholders and affects them merely as they are the owners of corporate stock. Jackson v. Stuhlfire, 28 Mass.App.Ct. 924, 925 (1990). See, e.g., Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C., 405 Mass. 506, 512-13 (1989) (suit for breach of fiduciary duty based on diversion of corporate funds belongs to corporation, not individual shareholders); Bessette v. Bessette, 385 Mass. 806, 809 (1982) (suit for breach of fiduciary duty based on excessive salary and other distributions to controlling shareholders belongs to corporation, not individual shareholders).
However, shareholders may resort to a direct, personal action against a miscreant fiduciary where the shareholders themselves have been defrauded, where it is difficult to establish a breach of a duly owed to the corporation, or where a corporate recovery would not provide a just measure of relief to the complaining shareholder. Crowley v. Communications for Hosp., Inc., 30 Mass.App.Ct. 751, 765, rev. den., 410 Mass. 1104 (1991); Hurley v. Federal Deposit Ins. Corp., 719 F.Sup. at 30. The test for a non-derivative suit is whether the individual shareholder has suffered an injury distinct from the injury suffered by the corporation.
The defendants characterize Diamond’s claim as a diversion of a corporate opportunity which resulted in damage to SBHI. See Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 528-30 (1997) (corporate officers are prohibited from taking for personal benefit an opportunity belonging to the corporation without first making full disclosure to disinterested directors or shareholders). However, Diamond’s complaint does not allege fraud perpetrated on the corporation which resulted in a diminution of SBHI’s worth; rather, the complaint alleges that Diamond personally was misled with respect to the Richdale spin-off. Viewing the record in the light most favorable to the plaintiff, the Richdale spin-off was not a corporate opportunily belonging to SBHI, which ceased to exist upon the contemporaneous sale to Garelick, but rather was an investment opportunity offered to the shareholders individually.
Shareholders in a close corporation owe each other a fiduciary duty of the utmost loyalty, trust, and confidence. Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C., 405 Mass. at 512; Bodio v. Ellis, 401 Mass. 1, 9 (1987). Claims that the majority shareholders failed to disclose facts material to a minority shareholder’s interests are personal to the shareholder. Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C., 405 Mass. at 513. Here, Diamond alleges that the defendants breached a fiduciary duty owed directly to her as a fellow shareholder by failing to disclose material facts concerning the Richdale spin-off which caused her to forgo that valuable opportunity. Such a claim belongs to Diamond personally and not to SBHI. Therefore, the defendants are not entitled to summary judgment on the ground that Diamond lacks standing to pursue the claims asserted in the complaint.
*505 THE STATUTE OF LIMITATIONS
The defendants also further contend that they are entitled to judgment as a matter of law because Diamond’s claims for fraud, misrepresentation and breach of fiduciary duty are time-barred. The three-year statute of limitations for torts applies to all these claims, including breach of fiduciary duty. See Demoulas v. Demoulas Super Markets, Inc., 424 Mass. at 517. Once the defendant shows that the action was brought more than three years from the date of the injury, the burden shifts to the plaintiff to prove facts that take the case outside the impact of the statute of limitations. O’Connor v. Redstone, 452 Mass. 537, 551 (2008); Riley v. Presnell, 409 Mass. 239, 244 (1991). To survive summary judgment, the plaintiff must demonstrate a reasonable expectation of proving that her claim was timely filed. Koe v. Mercer, 450 Mass. 97, 101 (2007).
In general, a cause of action based in tort begins to accrue when the injury occurs, or in the case of an inherently unknowable injury, when a reasonable person would have discovered that she had been harmed by the defendant’s actions. See Doe v. Harbor Schools, Inc., 446 Mass. 245, 254 (2006); Taygeta Corp. v. Varian Assoc., Inc., 436 Mass. 217, 229 (2002). However, with respect to a claim of breach of fiduciary duly, accrual of the statute of limitations occurs only when the plaintiff has actual, subjective knowledge of the fiduciary’s breach, and constructive knowledge will not suffice. O’Connor v. Redstone, 452 Mass. at 552; Doe v. Harbor Schools, Inc., 446 Mass. at 247,254; Lattuca v. Robsham, 442 Mass. 205, 213 (2004). See also Demoulas v. Demoulas Super Markets, Inc., 424 Mass. at 519-20 (where fiduciary relationship exists, failure to disclose facts that would give rise to knowledge of cause of action is equivalent to fraudulent concealment under G.L.c. 260, §12 and tolls limitations statute until plaintiff has actual knowledge of material facts giving rise to claim). “(T]he actual knowledge standard recognizes the dependent status of the beneficiary vis-a-vis the fiduciary, and protects the beneficiary’s legitimate expectation that the fiduciary will act with the utmost probity in all matters concerning the relationship.” Doe v. Harbor Schools, Inc., 446 Mass. at 255. Mere knowledge that the fiduciary has acted improperly does not amount to actual knowledge that the plaintiff has suffered harm. What is required is actual knowledge of facts sufficient to make a causative link between the fiduciary’s conduct and the beneficiary’s actual injury, although there need not be knowledge of the consequences of that injury. Id at 256-57.
The defendants contend that Diamond’s claims accrued on January 29, 1998, when Attorney Doniger sent a letter to Pappathanasi alleging a breach of fiduciary duty in connection with the attempted sale of SBHI and Richdale. Viewed in the light most favorable to the plaintiff, that letter evinces actual knowledge of fraud and breach of fiduciary duty with respect to the terms of the sale of SBHI to Garelick. However, the letter does not complain of or otherwise mention the terms offered to shareholders for the Richdale spin-off, the alleged wrongdoing which forms the basis of Diamond’s suit. Cf. Aiello v. Aiello, 447 Mass. 388, 407 n.28 (2006) (shareholder had actual knowledge sufficient to trigger statute of limitations for breach of fiduciary duty from diversion of corporate opportunities where she consulted with an accountant and wrote a letter to the board questioning whether she should have been allowed to participate in side businesses being run by her brothers, fellow shareholders). Although under the discovery rule, knowledge of a breach of fiduciary duty in connection with the sale to Garelick might put the plaintiff on notice of other breaches committed by the defendants in the same time period, constructive knowledge is insufficient under the stringent standard applicable to breach of fiduciary duly actions. Diamond’s testimony that she did not know that anything was amiss with respect to the Richdale spin-off until she saw Richdale LLC financial statements in 2004 raises a genuine issue of material fact with respect to when she acquired actual knowledge of the wrongdoing underlying this action. Accordingly, this Court concludes that the defendants are not entitled to summary judgment based on the statute of limitations.
THE RELEASE
Finally, the defendants contend that Diamond’s claims are barred as a matter of law by the May 1, 1998 Release, which applies broadly to all known and unknown claims which Diamond had as of that date against the defendants, including specifically breach of fiduciary claims connected with the SBHI stock sale. Releases are a form of contract, and the interpretation of an unambiguous release is a question of law for the court. Leblanc v. Friedman, 438 Mass. 592, 596-97 (2003); Cormier v. Central Mass. Chapter of the Nat'l Safety Council 416 Mass. 286, 288 (1993). Massachusetts courts will enforce a general release disposing of all claims and demands arising out of any transactions between the parties, even if they did not have in mind all the wrongs which existed at the time of the release. Leblanc v. Friedman, 438 Mass, at 597-98; Atlas Tack Corp. v. Crosby, 41 Mass.App.Ct. 429, 433, rev. den., 424 Mass. 1101 (1996). See also Sharon v. City of Newton, 437 Mass. 99, 105 (2002) (Mass, law favors enforcement of releases). A release containing broad language may constitute a general release even though it is prompted by the settlement of a particular dispute. Eck v. Godbout, 444 Mass. 724, 728 (2005). ‘The mere fact that the release itself identifies the specific matter that prompted the parties to execute a release, does not, by itself, operate to restrict the scope of a release that contains broad language releasing all claims of whatever nature the party executing the release may have against the party to whom the release is given.” Id The rule in Massachusetts is that parties who intend any limitation or exception to the scope of a general release should specifically state them therein. Atlas Tack Corp. v. *506 Crosby, 41 Mass.App.Ct. at 433. Here, the May 1, 1998 Release on its face encompasses Diamond’s claims for fraud and breach of fiduciary duty with respect to the Richdale spin-off.
Nonetheless, Diamond contends that the Release is not enforceable because it was induced by fraud. A release which is obtained without a full disclosure of the relevant facts by one who is under a duty to reveal them is voidable. Sher v. Sandler, 325 Mass. 348, 354 (1950) (release obtained in connection with sale of corporate stock voidable where defendant breached fiduciary duty of full disclosure with respect to stock sale, and release inextricably linked to sale). Cf. Gishen v. Dura Corp., 362 Mass. 177, 184 (1972) (settlement entered into on basis of fiduciary’s failure to disclose information material to that settlement is voidable).
A release is not effective to discharge a fiduciary’s liability for breach of the trust imposed in him unless the person executing the release had knowledge of all relevant facts that the fiduciary knew or should have known. Allen v. Moushegian, 320 Mass. 746, 757 (1947). See, e.g., Akin v. Warner, 318 Mass. 669, 675 (1945) (release not valid where fiduciary induced plaintiff to sign it by misrepresentation concerning investment account); Flynn v. Colbert, 251 Mass. 489, 493 (1925) (release did not bar action against guardian concerning settlement of estate where guardian misrepresented that he had accounted for all assets); Shane v. Shane, 891 F.2d 976, 986 (1st Cir. 1989) (release accompanying minority shareholder’s sale of stock in close corporation voided by other shareholders’ misrepresentation that company was worth nothing and failure to disclose pledge of new capital infusion).
The party seeking to void a release bears the burden of proving that it was obtained by fraud. Abrain v. Pereira, 336 Mass. 460, 462 (1957). Diamond argues that the defendants fraudulently obtained the Release by misrepresenting that Richdale was more trouble than it was worth, failing to disclose that Garelick would pay a related party debt due to Richdale, and failing to disclose a “business plan to quickly flip the Richdale business assets by selling the stores.” Viewed in the light most favorable to the plaintiff, the summary judgment record does not raise a genuine issue of material fact as to any of these claims of fraud. Pappathanasi’s statements that Richdale was “struggling,” had no future, was a losing business, and was more trouble than it was worth, to the extent they can be deemed to be more than mere assertions of opinion, are supported by the undisputed evidence in the summary judgment, particularly DiJanni’s testimony that throughout 1998, despite his prior efforts to cull out the weakest stores, Richdale consistently lost money. There is no admissible evidence in the record suggesting that the opinion that Richdale was worth between $2 and $3 million was demonstrably false.
In addition, the statement during the January 1998 shareholder meetings that Garelick was unlikely to pay inter-company debts could not have reasonably induced Diamond to enter into tire May 1, 1998 Release, given that any such statement was expressly contradicted by the December 19, 1997 Memorandum of Intent under consideration at those meetings, which expressly stated that Garelick would assume the debt of SBHI and its subsidiaries up to a maximum of $44 million. [3] See Marram v. Kobrick Offshore Fund Ltd., 442 Mass. 43, 59 (2004) (reliance on oral statements unreasonable as a matter of law in light of contrary written statements); Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 468 (2003) (fraud claim cannot be based on oral misrepresentation which contradicts terms of contemporaneous written document).
Lastly, the summary judgment record is devoid of admissible evidence from which a reasonable jury could find that on May 1, 1998, the defendants had a secret plan, which they concealed from Diamond, to flip the Richdale stores at great profit by selling them to managers. The undisputed evidence in the record is that Pappathanasi attempted over many months to sell the Richdale stores to a national chain as a going concern, and it was not until late 1998 that DiJanni suggested that the best option would be to sell all the stores to long-term Richdale managers and supervisors. Indeed, Diamond conceded in her deposition that her belief that there was a secret plan is based solely on the fact that the sale of the stores “happened very quickly after the sale and Arthur always had a plan.” A plaintiff may not defeat a motion for summary judgment merely by relying on conclusory allegations, improbable inferences, and unsupported speculation. Madsen v. Erwin, 395 Mass. 715, 721 (1985); Brooks v. Peabody & Arnold, LLP, 71 Mass.App.Ct. 46, 56, rev. den., 450 Mass. 1109 (2008). Based on the present summary judgment record, this Court concludes that Diamond has no reasonable expectation of proving that the Release was procured by fraud. Cf. Lee v. Allied Sports Assoc., Inc., 349 Mass. 544, 551 (1965) (court ruled as a matter of law that release was not procured by fraud); Walsh v. Fore River Shipbuilding Co., 230 Mass. 89, 92 (1918) (no jury question on validity of release where no evidence of false representations or fraudulent concealment). Accordingly, this Court concludes that the May 1, 1998 Release is an enforceable contract which bars all the claims asserted in this lawsuit.
ORDER
For the foregoing reasons, defendants’ motion for summary judgment is ALLOWED.

Pappathanasi’s recollection is that he did not discuss the issue of inter-company debt with the other shareholders because he did not feel it was important to the spinoff.

This term was also contained in the May 29, 1998 Memorandum of Intent which formed the basis of the actual transaction.