JOHN J. COSTA *vs.* BRAIT BUILDERS CORPORATION & another.[1]

Plymouth. April 3, 2012. - August 1, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Contract,* Public works, Construction contract, Subcontract, Bond, Performance
   and breach, Damages, Waiver. *Public Works,* General contractor, Payment
   bond. *Bond,* Construction contract bond, Public works. *Damages,* Breach
   of contract, Public works contract, Consumer protection case. *Consumer
   Protection Act,* Unfair act or practice, Attorney's fees.

In a civil action arising from a public construction project, the judge erred in
   directing a verdict in favor of the defendant general contractor with respect
   to claims of the plaintiff subcontractor under a payment bond that the general
   contractor had obtained pursuant to G. L. c. 149, § 29, where the strong
   public policy behind the statutory bond requirement rendered unenforceable
   a private agreement purporting to waive claims against such a bond. [69-73]
This court declined to disturb, on the basis of duplicative damages, the judg-
   ment in a civil action brought by a subcontractor against the general contrac-
   tor of a public construction project, alleging both breach of contract and
   violation of G. L. c. 93A, where the judge properly instructed the jury on the
   law of duplicative damages and G. L. c. 93A, and where the prevailing party
   argued facts plausibly giving rise to a G. L. c. 93A award factually separable
   and distinguishable from the party's common-law claims. [73-75]
In a civil action brought by a subcontractor against the general contractor of a
   public construction project, alleging violation of G. L. c. 93A, the award of
   attorney's fees to the subcontractor was proper, where a provision of the
   subcontract purporting to make the subcontractor responsible for its own at-
   torney's fees did not apply. [76]
In a civil action brought by a subcontractor against the general contractor of a
   public construction project, the judge erred in denying the contractor's mo-
   tion for a directed verdict on the subcontractor's claim for consequential
   damages, and in denying a subsequent motion for judgment notwithstand-
   ing the verdict, where the subcontract incorporated the terms of the general
   contract, which precluded claims of consequential damages arising out of
   the project. [77-79]

CIVIL ACTION commenced in the Superior Court Department on
May 3, 2005.

The case was tried before *Robert C. Rufo,* J., and a motion to
alter or amend the judgment was heard by him.

[1]Arch Insurance Company.

The Supreme Judicial Court granted an application for direct appellate review.

*Stephen Schultz* for Brait Builders Corporation.

*Danielle Andrews Long* for Arch Insurance Company.

*Eric S. Kupperstein* for the plaintiff.

*Carolyn M. Francisco & Michael T. Mullaly*, for Associated Subcontractors of Massachusetts, Inc., amicus curiae, submitted a brief.

SPINA, J. This case raises the question whether a subcontractor providing labor or materials to a public construction project for which a payment bond has been obtained by the general contractor pursuant to G. L. c. 149, § 29, may by private agreement forgo its right to pursue payment under the bond. In 2004 and early 2005, the plaintiff, John J. Costa, doing business as Costa & Son Construction (Costa or subcontractor), performed site work for the defendant Brait Builders Corporation (Brait or general contractor) on such a project in the town of Bridgewater (town). The relationship was not a happy one, and on January 28, 2005, Brait terminated Costa. Costa brought this suit alleging, inter alia, breach of contract and violations of G. L. c. 93A. Costa sought to recover damages under a payment bond obtained by Brait from the defendant Arch Insurance Company (Arch). See G. L. c. 149, § 29. Brait asserted similar counterclaims against Costa. Arch, for its part, defended by arguing that Costa had relinquished his right to claim against the bond pursuant to a provision of his subcontract with Brait. The matter went to trial. At the close of the plaintiff's case, a judge in the Superior Court, answering the question posed above in the affirmative, granted Brait and Arch's motion for a directed verdict and entered judgment with respect to Costa's claims seeking relief under the bond.[2] The trial eventually resulted in a jury verdict for Costa, against Brait. We granted Costa's application for direct appellate review to address the question of the validity of a subcontractor's waiver of claims against the general contractor's

---

[2]Because these were the only claims against Arch Insurance Company (Arch), the order granting the motion for a directed verdict resulted in Arch's dismissal from the case.

bond under G. L. c. 149, § 29,[3] and we now reverse the judgment granting the motion for a directed verdict. We also vacate the portion of the amended judgment granting consequential damages to Costa. We affirm the amended judgment in all other respects.

1. *Background.* We begin by reciting the basic facts of the case; we reserve other facts for our discussion of particular issues. Brait placed a successful bid with the town to build an addition to an elementary school. On June 3, 2004, Brait entered into a general contract with the town for $18,689,000 to build the addition (general contract). In accordance with G. L. c. 149, § 29, Brait obtained from Arch two bonds[4] — one securing payment on the project and one securing performance[5] — each worth the full amount of the contract.

On June 25, 2004, Brait entered into a subcontract to pay Costa $900,000 to perform site work on the project (subcontract). Site work refers to excavation and other preparation of the project site, such as digging tunnels for the placement of underground utilities and diverting surface water.

Costa began work on the project in mid-2004. Beginning in early 2005, the relationship between the parties began to unravel. On January 3, 2005, Brait sent Costa a letter alleging "undermanning and missed days" and stating it would "vigorously pursue[] all legal means available." Costa replied with a letter of his own claiming that as early as June, 2004, various scheduling and logistical mishaps by Brait — delayed building demoli-

---

[3]We acknowledge the amicus brief submitted by the Associated Subcontractors of Massachusetts, Inc., in support of the plaintiff.

[4]A construction bond is a surety's guarantee that a contractor will perform its duties under a construction contract. J. Lewin & C.E. Schaub, Jr., Construction Law § 9:1, at 618 (2009-2010). It is a tripartite relationship among a surety (here, Arch), its principal (here, Brait), and an obligee (here, the town). *Id.* at § 9:3, at 619. A surety issues a bond based on its assessment of the financial and technical competence of the principal. *Id.* at § 9:3, at 619-620, quoting E.G. Gallagher, Suretyship 1 (2d ed. 2000) ("the surety suffers a loss only if the principal fails to perform its obligation and is financially unable to reimburse the surety"). Unlike the related area of insurance, a surety seeks not to spread its losses but to avoid them altogether. J. Levin & C.E. Schaub, Jr., *supra* at § 9:3, at 620.

[5]The bond securing Brait's performance on the project is not at issue in this case. Construction of the addition to the elementary school eventually was completed.

tion, the unexpected presence of steel erectors, lack of a tarp and proper heating — had delayed and added expenses to Costa's performance of the contract work. On January 12, 2005, Brait wrote to Costa alleging that the subcontractor's absence from the site had caused water to accumulate on the project site. Costa replied alleging that his efforts to remove the water had been hampered by Brait.

On January 28, 2005, Costa sent Brait a letter announcing that he was "discontinuing all site work . . . due to . . . extreme weather conditions," and stating that he would return when the ground thawed. On the same day, Brait announced in a letter that it was terminating Costa due to "[u]nacceptable performance," and that Costa was barred from further accessing the project site without Brait's written consent.

On May 3, 2005, Costa initiated the present action. In his complaint, Costa alleged that Brait had committed a breach of the subcontract by obstructing Costa's performance, failing to pay him the balance under the subcontract owed, and barring him from the project site. Costa further claimed that he was owed money under a quantum meruit theory and that Brait had violated G. L. c. 93A, § 11, the section of our consumer protection law protecting persons engaged in business from unfair or deceptive acts or practices. The complaint sought relief under the bond issued by Arch, and Arch was named as a defendant. Arch and Brait answered, denying the allegations, and Brait alleged similar counterclaims against Costa.[6]

After some five years of litigation, the matter went to trial in August, 2010. On August 16, at the close of the plaintiff's case, Brait and Arch sought and were granted a directed verdict on the bond claims. Arch was thereby dismissed as a party, see note 2, *supra*, and the case proceeded against Brait.

On August 19, the jury rendered a verdict in favor of Costa, awarding general damages (breach of contract and quantum meruit) in the amount of $199,228.14, consequential and incidental damages in the amount of $133,648, and damages for unfair or deceptive acts or practices under G. L. c. 93A in the amount of $167,123.86 — a total award of $500,000. Costa

---

[6]Prior to this appeal, Brait Builders Corporation (Brait or general contractor) and Arch were represented by the same counsel.

then moved for attorney's fees pursuant to G. L. c. 93A, § 11. An amended judgment[7] on the verdict followed, ordering Brait also to pay Costa interest from the date the action was filed and attorney's fees in the amount of $300,693.75. The total amount of the amended judgment against Brait, including attorney's fees and interest, was $1,124,039.05. Both Brait and Costa appealed.

2. *Relinquishment of bond claims.* We first consider Costa's appeal of the directed verdict in favor of Brait and Arch, which foreclosed Costa's ability to seek payment from the bond. Article 7 of the subcontract (article 7) provided in relevant part:

> "In the event that the subcontractor does not provide performance and payment bonds on a form acceptable to the Contractor, then the subcontractor waives its right to claim against the Contractor's performance and payment bonds as provided to the Awarding Authority."

Brait subsequently asked Costa to provide performance and payment bonds each in the full amount of the subcontract, $900,000. Costa, however, was unable to do so.[8] During trial, after the plaintiff rested his case, Brait and Arch sought a directed verdict based on the plain language of article 7. See Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974). Finding that "article 7 is applicable and . . . quite clear," the judge allowed the motion.

On appeal, Costa argues that article 7 violates the public policy of the Commonwealth and cannot be enforced. See generally, e.g., *Beacon Hill Civic Ass'n* v. *Ristorante Toscano, Inc.,* 422 Mass. 318 (1996). He argues that the requirement under G. L. c. 149, § 29 (§ 29), of a bond on certain public construction projects reflects a strong public policy of encouraging competitive bidding for, and swift completion of, such projects, see *Peters* v. *Hartford Acc. & Indem. Co.,* 377 Mass. 863, 872 (1979); *Manganaro Drywall, Inc.* v. *White Constr. Co.,* 372 Mass.

---

[7]The original judgment issued on August 23, 2010, and that document subsequently was amended for reasons not relevant here. The amended judgment, issued September 21, 2010, is the subject of the present appeal.

[8]At trial, Brait's prior knowledge about the ability of the plaintiff, John J. Costa, doing business as Costa & Son Construction (Costa or subcontractor), to obtain the bond was a disputed issue.

661, 663-664 (1977), rendering a waiver by private agreement unenforceable.

Arch responds by arguing that the bond requirement serves primarily a private purpose: to place laborers and materialmen who work on public construction projects — for which mechanic's liens are disallowed, *Lessard* v. *Revere*, 171 Mass. 294, 294-295 (1898) — on the same footing as those who work on private construction projects, for which mechanic's liens are allowed under G. L. c. 254. Stated otherwise, § 29 provides a direct benefit to laborers and materialmen — security against nonpayment — not to the public. Any benefit the statute may provide to the public is only incidental, Arch argues, and not sufficient to override freedom of contract and mutual risk-taking.[9] See *Canal Elec. Co.* v. *Westinghouse Elec. Corp.*, 406 Mass. 369, 377-378 (1990) (permitting waiver of G. L. c. 93A, § 11, claim by business plaintiff).

Because Costa raises this public policy argument for the first time on appeal, we would generally consider it waived. See *Carey* v. *New England Organ Bank*, 446 Mass. 270, 285 (2006). Because the question has been "fully briefed," is of public importance, and may arise again, however, we think it an appropriate exercise of our discretion to address it.[10] See, e.g., *Police Dep't of Salem* v. *Sullivan*, 460 Mass. 637, 640 (2011).

We begin, as always, with the statutory text. *Adams* v. *Boston*, 461 Mass. 602, 609 (2012). The version of § 29 in effect at the

---

[9]Arch also argues that article 7 of the subcontract between Brait and Costa (article 7) is not a "waiver" but, rather, a "condition precedent." This argument does not alter the issue presented in any relevant way: regardless of the terminology used, article 7, if enforced, would result in relinquishment of Costa's right to claim payment from the bond.

[10]Arch argues it will be prejudiced by the court's consideration of the bond issue, contending that on remand it will have to incur the additional expense of presenting "procedural and equitable defenses available to it" at a trial. We disagree. It is a bedrock principle that the surety's liability on a payment bond is coextensive with that of its principal. *John W. Egan Co.* v. *Major Constr. Mgt. Corp.*, 46 Mass. App. Ct. 643, 646-647 (1999). See J. Lewin & C.E. Schaub, Jr., Construction Law § 9:86, at 665 (2009-2010). Brait's — and thus Arch's — liability under the payment bond has already been decided by the jury and is reflected in the general damages award. Any remaining defenses Arch might assert are likely legal questions appropriate for summary judgment. See, e.g., *C & I Steel, LLC* v. *Travelers Cas. & Sur. Co.*, 70 Mass. App. Ct. 653, 657-659 (2007) (surety only liable for amounts falling within terms of bond).

time provided that on public construction projects where the amount of the contract is more than $2,000, contracting authorities "shall obtain security by bond in an amount not less than one half of the total contract price, for payment by the contractor and subcontractors for labor performed or furnished and materials used or employed therein."[11]

The statutory text says nothing of waiver. The parties draw opposing inferences from this silence. Noting that § 29 is based on the mechanic's lien statute, G. L. c. 254, under which waiver is explicitly prohibited, see G. L. c. 254, § 32, Arch infers from the statutory silence in § 29 that waivers are permitted. Costa replies by arguing that the strength of the public policy behind the bond requirement obviates the need for an explicit waiver prohibition and that G. L. c. 254, § 32, only includes such a prohibition because it also lists exceptions to that general rule. We need not enter this briar patch — for our purposes, it suffices to say that the text of § 29 "does not answer clearly the question posed." *Adams* v. *Boston, supra* at 611.

Having found no answer in the statute's text, we next turn to its legislative history. See *id.* We examine "the cause of [the statute's] enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Id.,* quoting *Industrial Fin. Corp.* v. *State Tax Comm'n,* 367 Mass. 360, 364 (1975). But this signpost, too, points in different directions. Arch is correct that, as the court has stated on several occasions, § 29 was passed to benefit laborers and materialmen who work on public construction projects, given the impossibility of obtaining a mechanic's lien on such projects. See, e.g., *Massachusetts Gas & Elec. Light Supply Co.* v. *Rugo Constr. Co.,* 321 Mass. 20, 23 (1947), quoting *Burr* v. *Massachusetts Sch. for the Feeble-Minded,* 197 Mass. 357, 360 (1908) ("The object of [§ 29] is to give those furnishing labor and materials 'security equivalent to the lien which the law creates upon the property of other owners in like cases' "). See also *Manganaro Drywall, Inc.* v. *White Constr. Co.,* 372 Mass. 661, 663-664 (1977) ("The

_____

[11]In 2010, G. L. c. 149, § 29, was amended to limit the bond requirement to public construction projects where the amount of the contract "is more than $25,000." St. 2010, c. 188, § 62.

encouragement of prompt payment of general contractors' obligations to subcontractors and materialmen is a substantial object of § 29"); *LaBonte* v. *White Constr. Co.*, 363 Mass. 41, 45 (1973), quoting *Lawrence Plate & Window Glass Co.* v. *Varrasso Bros.*, 353 Mass. 631, 633 (1968) (§ 29 is "a remedial statute, to be construed broadly to effect its purpose of affording security to subcontractors and materialmen on public works"). But we also have said the statute was designed with benefits to the general public in mind. See *Peters* v. *Hartford Acc. & Indem. Co.*, 377 Mass. 863, 872 (1979) (public policy animating § 29 includes "promot[ing] the unhampered completion of [public] projects"); *Manganaro Drywall, Inc.* v. *White Constr. Co.*, *supra* at 664 (statute "may encourage subcontractors to bid on public works projects" and reduce incidence of subcontractors submitting higher bids to hedge against unreasonable delays in payment). Indeed, the dual public-private purposes are reflected in the title of the act that added § 29 to the General Laws: "An Act expediting payments to general contractors and to subcontractors *and* improving the flow of funds in the construction industry" (emphasis added). St. 1972, c. 774. The question, therefore, is not whether § 29 was designed exclusively for a public or private purpose — it was not — but rather whether the public purpose is sufficiently weighty to preclude waiver by private agreement.

Our study of the statutory scheme for public construction, and the mechanic's lien statute, G. L. c. 254, leads us to conclude that the strong public policy behind the § 29 bond requirement renders unenforceable a provision purporting to waive claims against such a bond. We have long held that § 29 should be construed liberally to achieve the remedial purpose of providing security to subcontractors and others who supply labor or materials for public construction projects. See *LaBonte* v. *White Constr. Co.*, *supra*; *Lawrence Plate & Window Glass Co.* v. *Varrasso Bros.*, *supra* at 633, and cases cited. It is undisputed that § 29 is an outgrowth of the mechanic's lien statute, *Massachusetts Gas & Elec. Light Supply Co.* v. *Rugo Constr. Co.*, *supra*, under which waivers are explicitly proscribed as "against public policy," G. L. c. 254, § 32. Given our broad interpretation of § 29 and its remedial purpose, it would be anomalous to ascribe to the Legislature an intent to forbid waivers under G. L. c. 254,

§ 32, but to permit them under § 29.[12] Cf. *American Cas. Co.* v. *Coastal Caisson Drill Co.*, 542 So. 2d 957, 958 (Fla. 1989) (amendment to Florida mechanic's lien statute explicitly precluding waiver evinced "legislative policy against waiver" relevant to bond statute). In addition, the presence of the bond requirement throughout the statutory scheme for public construction is evidence of its significant importance. See G. L. c. 30, §§ 39F, 39M, 40; G. L. c. 149, §§ 29, 44A, 44D, 44E; G. L. c. 149A, §§ 5, 8. We think the better view is that § 29 embraces a substantial public policy, precluding waiver. Accordingly, we conclude that article 7 of the subcontract is unenforceable, and we reverse the order granting the motion for a directed verdict.

3. *Duplicative damages.* Brait argues that the portion of the amended judgment awarding damages under G. L. c. 93A (c. 93A) must be vacated as duplicative of the general damages awarded for breach of contract. In our cases discussing jury verdicts that award damages under both a common-law theory, such as breach of contract, and c. 93A, we have stated that the awards must be based on acts that are "factually separable and distinguishable." *Calimlim* v. *Foreign Car Ctr., Inc.*, 392 Mass. 228, 236 (1984). This is because our consumer protection law was not intended to authorize duplicative recoveries for the same wrong. *McGrath* v. *Mishara*, 386 Mass. 74, 85 (1982). Thus, where a judge or jury discernibly award separate recoveries under c. 93A and a common-law claim based on the same act, one recovery is precluded, with preference given to retaining the c. 93A award. *Calimlim* v. *Foreign Car Ctr., Inc., supra* at 235-236 (separate recovery for breach of warranty disallowed where based on facts found to be violative of c. 93A). Here, we conclude that because the jury were instructed properly on the law of duplicative damages and c. 93A, and the plaintiff argued facts plausibly giving rise to a violation of c. 93A, the award need not be disturbed.

The special verdict slip given to the jury contained separate

---

[12]In other jurisdictions, waivers of claims against public construction bonds are proscribed by statute. See, e.g., Md. Code Ann., Real Prop. § 9-113(*a*) (LexisNexis 2010); Minn. Stat. Ann. § 337.10 (West 2002). The absence of an explicit proscription in Massachusetts is, as we have stated, susceptible to differing interpretations.

questions asking whether Brait had committed a breach of its contract causing damage to Costa, and whether Brait had committed unfair or deceptive acts or practices causing damage to Costa. The judge chose not to include specific interrogatories to clarify which facts the jury were relying on for each award of damages. Before the jury retired, the judge reviewed the verdict slip with the jury, instructing them on each type of damages. The judge stated:

> "You'll notice that there are several areas . . . in which you can consider awarding damages. There must not be any overlapping of the award of damages. Each area or category is entitled to its own separate distinction. . . . [I]f you decide, for example, to award damages under [breach of contract], those damages . . . should not reflect, for example, a [c.] 93A award, because that is in a separate category . . . ."[13]

Although not explicitly using the term "duplicative damages," these instructions adequately conveyed the law.

At trial, Costa sought to prove breach of contract primarily by showing that Brait had withheld an amount of "retainage" payments in excess of that agreed to in the subcontract. "Retainage" refers to a percentage of the contractor's periodic payments to the subcontractor that the contractor withholds "to ensure satisfactory completion of the work." J. Lewin & C.E. Schaub, Jr., Construction Law § 9:4, at 620 (2009-2010). Article 1 of the subcontract between Costa and Brait provided for five per cent retainage, but when Costa could not obtain the bond, Brait began to withhold twenty per cent retainage. Brait claimed the additional money was withheld pursuant to internal policy and an oral agreement with Costa; Costa denied any agreement. In all, Costa alleged that $125,511.33 in retainage had been improperly withheld.[14]

As for unfair and deceptive acts or practices under c. 93A, Costa's principal allegation was that Brait was engaged in a

---

[13]The judge had discussed this instruction with the parties in advance, stating, "In this case . . . we want [the jury] to separate [the damages] out because of the [G. L. c.] 93A component."

[14]Costa also sought over $200,000 on a quantum meruit theory for "extra work" that he claimed to have performed at Brait's request.

scheme to obtain benefits from the subcontract — i.e., Costa's site work — without paying for them. See generally *Wang Labs., Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854 (1986). Costa argued that he was forced to suspend work on the project site due in part to Brait's poor maintenance of the site and poor coordination. This led to Costa's termination for "abandonment," which, according to Costa, caused Brait to retain money otherwise due Costa for overhead and profits. In all, Costa alleged that Brait's actions had deprived him of $262,204.60 in overhead and profits.

A reasonable jury could find that these facts, which are distinguishable from the facts regarding retainage, supported the existence of an unfair or deceptive act or practice under G. L. c. 93A, § 11.[15] Of course, absent a verdict slip containing specific interrogatories, see Mass. R. Civ. P. 49, 365 Mass. 812 (1974), we can never know precisely what facts the jury relied on in awarding damages under c. 93A. Where, however, the prevailing party argues facts plausibly giving rise to a c. 93A award "factually separable and distinguishable" from the party's common-law claims, and the judge properly instructs the jury on the law of c. 93A and duplicative damages, "[w]e presume that the jury followed the judge's instructions." See *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. 865, 870 (1993). Contrast *Calimlim* v. *Foreign Car Ctr., Inc.*, 392 Mass. 228, 236 (1984) (judge's factual findings did not contain facts distinguishing two harms); *Charles River Constr. Co.* v. *Kirksey*, 20 Mass. App. Ct. 333, 343-344 (1985) (no instruction on duplicative damages). That being the case here, we decline to disturb the amended judgment on the basis of duplicative damages.[16]

---

[15]The fact that the jury found Brait's actions were not "willful[] or knowing[]" does not persuade us otherwise. The requirement of "willful or knowing" goes to the issue of multiple damages, not to whether there was a violation of G. L. c. 93A (c. 93A). In the circumstances presented here, the jury reasonably could have found that Brait's actions constituted an unfair or deceptive act or practice unrelated to the breach of contract claims.

[16]We also reject Brait's somewhat convoluted argument that the amount of damages awarded under c. 93A was impermissibly high, either because Costa's counsel asked the jury to punish Brait, or because the total award amounted conspicuously to a round number, $500,000. The award was based properly on the evidence presented.

4. *Attorney's fees.* Brait also takes issue with the attorney's fees awarded to Costa by the judge following the jury's award of damages under c. 93A. See G. L. c. 93A, § 11 (authorizing award of "reasonable attorney's fees and costs"). Brait points to article 13 of the subcontract, which provides:

> "*DISPUTE RESOLUTION*: Any controversy or claim arising out or [*sic*] related to the contract, or breach thereof, may be settled by arbitration. The decision whether to arbitrate or litigate disputes shall be at the sole discretion of the Contractor, and the Subcontractor waives the ability to contest the Contractor's election of litigation over arbitration. In the event that the Subcontractor recovers less than amounts claimed, Subcontractor shall be responsible for attorney's fees."

Brait contends that Costa's $500,000 jury verdict was less than "amounts claimed" and that, accordingly, Costa is "responsible for [his] own attorney's fees." Costa responds that the attorney's fees clause of article 13 applies to arbitration and is wholly inapplicable to litigation.

We conclude that Costa has the better argument. Whether the provision applies when a dispute is settled by litigation, as opposed to arbitration, is at best ambiguous.[17] Insofar as the provision is ambiguous, we construe it against the drafter, who in this case is Brait. 2 Restatement (Second) of Contracts § 206, at 105 (1981). We therefore conclude that article 13 does not apply,[18] and the award of attorney's fees must stand.[19]

---

[17]At worst, the provision clearly favors Costa. Costa points out, correctly, that the provision would make little sense in the litigation context, where it is the norm for parties to bear their own attorney's fees, obviating the need for a contractual provision stating as much. Compare Minnerop, Attorneys' Fees in Arbitration, 61 Bus. Law. 589, 589 (2005-2006) ("the American Rule . . . is often stretched, modified, or ignored in arbitration proceedings").

[18]Brait argues in the alternative that the award of attorney's fees was unreasonable in amount and should be reduced. Brait has failed, however, to include in the record on appeal the transcript of the hearing in which the judge considered attorney's fees. See Mass. R. A. P. 8 (b) (1), as amended, 430 Mass. 1601 (1999) ("If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, he shall include in the record a transcript of all evidence relevant to such finding or conclusion"). We therefore consider the argument waived.

[19]Costa's brief included a request for appellate attorney's fees and costs. See

5. *Consequential damages.* Prior to trial, Brait and Arch moved for a directed verdict on Costa's claims for consequential damages, arguing that such damages were precluded by a provision in the general contract (between Brait and the town) that had been incorporated into the subcontract. The motion was denied, and when Brait subsequently moved for a judgment notwithstanding the verdict on consequential damages, that motion also was denied. This was error.

The first paragraph of the subcontract between Costa and Brait contained an "incorporat[ion] by reference" clause, expressly incorporating the terms of the general contract between Brait and the town into the subcontract. Further, article 2 of the subcontract stated, in relevant part:

> "The Subcontractor agrees to be bound to the Contractor by the terms of the [general contract] and to assume to the Contractor all the obligations and responsibilities that the Contractor by those documents assumes to the awarding authority, except to the extent that provisions contained therein are by the terms or by law applicable only to the Contractor."[20]

In turn, article 4.3.10 of the general contract between Brait and the town stated:

> "The Contractor waives Claims against the Owner for consequential damages arising out of or relating to this Contract. This includes: (1) damages incurred by the Contractor for . . . losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work."[21]

Brait argues that these provisions worked in concert to preclude claims of consequential damages arising out of the project, and

---

*Yorke Mgt. v. Castro*, 406 Mass. 17, 20 (1989). As stated below, because Costa has successfully defended his award under c. 93A, he may apply for attorney's fees and costs according to the procedure specified in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004).

[20]This language is substantially similar to that used in the statutory form for subbids under G. L. c. 149, § 44F.

[21]The exception for anticipated profit was not available to Costa, as article 9 of the subcontract provided, "The Subcontractor is not entitled to recover lost or anticipated profits if the Subcontract is terminated."

therefore its motion for a directed verdict should have been allowed. We agree.

The subcontract here unambiguously incorporates the general contract, article 4.3.10 of which unambiguously precludes recovery of consequential damages. We see no need to look further than this explicit language. So-called "flow down" clauses, pursuant to which the contractor's obligations "flow down" to the subcontractor, are an acceptable and common method for general contractors to limit risk. See J. Lewin & C.E. Schaub, Jr., Construction Law § 7:6, at 450-451 (2009-2010). See also *Capricorn Power Co.* v. *Siemens Westinghouse Power Corp.*, 324 F. Supp. 2d 731, 751 (W.D. Pa. 2004). Our Appeals Court has on two prior occasions approved the use of such clauses to pass a provision of the general contract along to a subcontractor. See *Massachusetts Elec. Sys., Inc.* v. *R. W. Granger & Sons, Inc.*, 32 Mass. App. Ct. 982, 982 (1992) (arbitration provision); *B.J. Harland Elec. Co.* v. *Granger Bros.*, 24 Mass. App. Ct. 506, 509-514 (1987) (provision precluding damages on account of delay). We see no special policy reason to fashion an exception for waivers of consequential damages, particularly as there may be good reason for the parties in construction contracts to exclude such damages.[22] Cf. G. L. c. 106, § 2-719 (3) (provisions in contracts for sale of goods waiving consequential damages permissible unless unconscionable). Subcontractors, particularly those with substantial industry experience such as the plaintiff, are well advised to examine both their own subcontract and any provisions that might be incorporated from the general contract, before agreeing to them.

For the reasons stated, even construing the evidence "most favorably to the plaintiff" as we must do, *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), Brait's motion for a directed verdict

---

[22]The general contract used by Brait and the town was fashioned from General Conditions of the Contract for Construction, a template produced by the American Institute of Architects. In the 1990s, that document was revised to include the waiver of consequential damages at issue here. See generally Ernstrom, Mutual Waiver of Consequential Damages: The Contractor's Perspective, 18 Constr. Law. 4 (Jan. 1998). The change was wrought in an attempt to "limit the expense and unpredictability of construction contract litigation." *Id.* at 5. Some of the consequential damages claimed by the plaintiff here, including his going out of business and his house being foreclosed on, may provide a case in point.

on consequential damages should have been allowed. We vacate the award of consequential damages.[23]

6. *Conclusion.* The judgment on the directed verdict in favor of Brait and Arch is reversed, and the case is remanded for proceedings consistent with this opinion. On remand, the amended judgment shall be modified to strike the jury's award of consequential damages[24] and to calculate interest on the modified sum. The amended judgment is affirmed in all other respects.[25]

*So ordered.*

---

[23]In its brief, Brait also took issue with the general damages award. At oral argument, however, counsel for Brait opened by stating that the only money Costa was entitled to in this case was the $199,228.14 general damages award. We take from this that Brait no longer contests that award. In any event, the award permissibly was based on the evidence presented.

[24]The amended judgment does not show an award of consequential damages. This is because when the trial judge amended the judgment, he subsumed the $133,648 consequential damages award into the breach of contract award. That amount of consequential damages, plus the interest awarded thereon, is the award that must be vacated.

[25]The plaintiff may file a request with supporting documentation for an award of appellate attorney's fees and costs under G. L. c. 93A, § 11, with the clerk of the court for the Commonwealth, according to the procedure set forth in *Fabre* v. *Walton,* 441 Mass. 9, 10-11 (2004).