Salinger, Kenneth W., J.
NetScout Systems, Inc., seeks a preliminary injunction that would enforce non-competition and other covenants agreed to by Carl Hohenstein when he was employed by Danaher Corporation’s subsidiaries. When NetScout acquired Danaher’s communications business, Hohenstein became a NetScout employee and Danaher assigned its rights under the contract with Hohenstein to NetS-cout. Eighteen months later, Hohenstein left NetScout to work for a competitor. Hohenstein agrees he was bound by NetScout’s code of business conduct, including its restrictions on the use or disclosure of NetScout’s proprietary information. At oral argument, Hohenstein said he does not contest the issuance of an injunction that would bar him from using or disclosing any NetScout proprietary information, helping to develop products or services that would compete with NetScout’s offerings, helping to hire away NetScout’s employees or contractors, or interfering in any relationship with NetScout’s vendors. But Hohenstein contends that NetScout is not entitled to án injanction that would bar Hohenstein from selling or trying to sell products or services that compete with NetScout.
The Court concludes that, although NetScout is entitled to enforce the noncompetition agreement assigned to it by Danaher, that contract does not bar Hohenstein from selling or trying to sell products or services that compete with those of NetScout. In any case, the contract provisions that barred Hohenstein from selling products and services that compete with those of Danaher and its subsidiaries lapsed in July 2016, twelve months after Hohenstein’s employment with Danaher subsidiaries came to an end. The Court will therefore deny NetScout’s motion to the extent it seeks to bar Hohenstein from selling products that compete with NetScout’s offerings (covered in paragraphs 2 and 3 of the form of order proposed by NetScout). It will allow the motion only to the extent it seeks to protect NetScout’s proprietary information and to obtain other relief that is not opposed by Hohenstein (covered in paragraphs 1, 4, 5, 6, and 7 of the proposed order, which the Court will renumber as paragraphs 1 through 5).
1. Findings of Fact
The Court makes the following findings of fact based on the affidavits submitted by NetScout and Mr. Hohenstein.
Hohenstein worked for subsidiaries of Danaher Corporation from January 2001 through July 2015. Throughout this time he was employed at-will, with no fixed contract term. Hohenstein worked for Fluke Networks, Inc., as a sales engineer from September 2004 to April 2014, and as a senior systems engineer through April 2015. He then worked for AirMagnet, Inc. (an affiliated company, also owned by Danaher) as senior systems engineer.
In late 2011 Hohenstein and Danaher entered into an “Agreement Regarding Solicitation and Protection of Proprietary Interests” that governed Hohensteiris continued employment by Danaher or any of its subsidiaries. This Agreement included provisions requiring Hohenstein not to use or disclose any confidential information belonging to “the Company” for any purpose other than performing his duties as a Danaher employee, and not to compete with “the Company” by soliciting potential customers to purchase, selling or offering to sell, or helping to develop competing products while employed by “the Company” and for twelve months thereafter. The Agreement defined “the Company” to mean “Danaher Corporation including its subsidiaries and/or affiliates.” The phrase “the Company” did not include any assigns of Danaher or its subsidiaries or affiliates.
NetScout acquired Danaher’s communications business, which included Fluke Networks and AirM-agnet, on July 14, 2015. This was structured as an asset deal, in which Danaher transferred certain assets and liabilities to NetScout, not as a stock transaction. [1] As of that date Hohenstein became a NetScout employee and his employment relationship with any Danaher subsidiary came to an end. As part of this transaction, Danaher assigned to NetScout its rights under the 2011 Agreement between Danaher and Hohenstein. (NetScout has not presented any documentation of this assignment. But Hohenstein does not dispute NetScout’s evidence that Danaher assigned its contract rights to NetScout, at least for the purpose of resolving the pending motion for a preliminary injunction.) Hohenstein and NetScout never entered into any non-competition or non-solicitation agreement of their own. During 2016 NetScout asked Hohenstein to sign a “Commission Plan” that contained a statement that the plan was not valid unless it was accompanied by a signed non-compete agreement. Hohenstein never signed the Commission plan or any non-competition agreement with NetScout. But Hohenstein did agree to abide by NetScout’s code of business conduct, which limits the use or disclosure of NetScout’s proprietary information.
NetScout says that it sells “application and network performance management products and solutions.” Hohenstein worked for NetScout as a principal sales engineer for the mid-Atlantic region, which consisted of the District of Columbia and the states of Pennsylvania, Maryland, Virginia, West Virginia, Ohio, Michi *150 gan, Indiana, and Kentucky. He served in a pre-sales and support role in which he made technical presentations to prospective or current customers about NetScout’s products, learned about the prospect’s or customers IT infrastructures, and helped to explain to prospects and customers how NetScout’s products could help them better manage their IT networks. Hohenstein had access to confidential financial information about NetScout’s sales and customer accounts in his territory, including information about the customer’s networks and technical requirements. He did not have access to similar information about other regions or about customers located outside of his region. He had complete access to information about NetScout’s product offerings. (Given the Court’s rulings below, it need not make any findings as to whether NetScout has met its burden of proving that the technical product information to which Hohenst-ein was privy was confidential, as opposed to something that is routinely shared with customers.) Hohenstein accompanied NetScout’s account managers on customer visits and built relationships with customers located in NetScout’s mid-Atlantic region. He was well compensated by NetScout, which paid him more than $200,000 per year.
In January 2017 Hohenstein left NetScout to work for a competitor called Riverbed Technologies, Inc. Like NetScout, Riverbed markets information technology solutions for network performance management, application performance management, and cloud virtualization. Riverbed has published at least one marketing paper that compares the architecture and performance of its products with those sold by NetS-cout.
Riverbed employs Hohenstein as its sales engineer director/manager for the New England states (excluding western Connecticut), North New York state, and Eastern Canada. At Riverbed, Hohenstein has no direct customer interaction. Instead he supervises other sales engineers who do have customer contact
2. Legal Standards
2.1. Motions for Preliminary Injunction
“A preliminary injunction is an extraordinary remedy never awarded as of right.” Winter v. Natural Res. Def. Council Inc., 555 U.S. 7, 24 (2008). To the contrary, “the significant remedy of a preliminary injunction should not be granted unless the plaintiffs had made a clear showing of entitlement thereto.” Student No. 9 v. Board of Educ., 440 Mass. 752, 762 (2004). “Trial judges have broad discretion to grant or deny injunctive relief.” Lightlab Imaging, Inc. v. Axsun Technologies, Inc., 469 Mass. 181, 194 (2014).
A plaintiff is not entitled to preliminary injunctive relief if it cannot prove that it is likely to succeed on the merits of its claim. See, e.g, Fordyce v. Town of Hanover, 457 Mass. 248, 265 (2010) (vacating preliminary injunction on this ground); Wilson v. Commissioner of Transitional Assistance, 441 Mass. 846, 858-59 (2004) (same). Nor may a plaintiff obtain a preliminary injunction without proving that it will suffer irreparable harm in the absence of such an order, and that such harm to the plaintiff from not granting the preliminary injunction would outweigh any irreparable harm that defendants are likely to suffer if the injunction issues. See, e.g., American Grain Products Processing Institute v. Department of Pub. Health, 392 Mass. 309, 326-29 (1984) (vacating preliminary injunction on this ground); Nolan v. Police Comm'r of Boston, 383 Mass. 625, 630 (1981) (same). “The public interest may also be considered in a case between private parties where the applicable substantive law involves issues that concern public interest[s].” Bank of New England, N.A. v. Mortgage Corp. of New England, 30 Mass.App.Ct. 238, 246 (1991). Under Massachusetts law, “[a] covenant not to compete contained in a contract for personal services” is only enforceable to the extent that it is consistent with the public interest. All Stainless, 364 Mass. at 778.
2.2. Non-Compete and Non-Solicitation Agreements
An employee’s agreement not to compete with his or her employer by soliciting away customers or potential customers may only be enforced under Massachusetts law to the extent necessary to protect the employer’s legitimate business interests — which include guarding against the release or use of trade secrets or other confidential information, or other harm to the employer’s goodwill, but do not include merely avoiding lawful competition — and to the extent it is reasonable in scope in terms of the activities it restricts, the geographic limitations it imposes on those activities, and the length of time it is in effect. See New England Canteen Services, Inc. v. Ashley, 372 Mass. 671, 673-76 (1977); All Stainless, Inc. v. Colby, 364 Mass. 773, 778-80 (1974). The employer has the burden of proving that the agreement protects legitimate business interests and thus is enforceable. New England Canteen Services, supra, at 675; Folsum Funeral Service, Inc. v. Rodgers, 6 Mass.App.Ct. 843 (1978) (rescript).
“Protection of the employer from ordinary competition ... is not a legitimate business interest,” however, “and a covenant not to compete designed solely for that purpose will not be enforced.” Marine Contractors, Inc. v. Hurley, 365 Mass. 280, 287-88 (1974); accord, e.g., Boulanger v. Dunkin' Donuts, Inc., 442 Mass. 635, 641 (2004), cert. denied, 544 U.S. 922 (2005).
Thus, “[a]n employer may prevent his employee, upon termination of his employment, from using, for his own advantage or that of a rival and to the harm of his employer, confidential information gained by him during his employment; but he may not prevent the employee from using the skill and general knowledge acquired or improved through his employment.” Abramson v. Blackman, 340 Mass. 714, 715-16 (1960); accord, e.g., Richmond Bros., Inc. v. Westing *151 house Broadcasting Co., Inc., 357 Mass. 106, 111 (1970); Woolley’s Laundry v. Silva, 304 Mass. 383, 387 (1939). “The ‘right (of an employee) to use (his) general knowledge, experience, memory and skill’ promotes the public interest in labor mobility and the employee’s freedom to practice his profession and in mitigating monopoly.” Dynamics Research Corp. v. Analytic Sciences Corp., 9 Mass.App.Ct. 254, 267 (1980), quoting J.P. Healy & Son v. James A. Murphy & Son, 357 Mass. 728, 740 (1970); accord Club Aluminum Co. v. Young, 263 Mass. 223, 226-27 (1928).
A contractual covenant restraining competition by a former employee “will be enforced ‘only to the extent that is reasonable and to the extent that it is severable for the purposes of enforcement.’ ” Blackwell v. E.-M. Helides, Jr., Inc., 368 Mass. 225, 229 (1975), quoting All Stainless, supra, at 778.
3. Analysis
3.1. NetScout’s Rights to Enforce the Agreement
Hohenstein’s contract with Danaher is an enforceable contract. And NetScout is entitled to enforce Hohenstein’s obligations under that contract as Danaher’s assignee.
The 2011 Agreement was supported by adequate consideration, even though Hohenstein had already been working for a Danaher subsidiary for almost twelve years and was not given any additional compensation in exchange for executing the new contract. Hohenstein was an employee at will. Continued at-will employment is sufficient consideration to support a non-compete agreement in Massachusetts, just as it is sufficient consideration to support other contractual terms. Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 552 (1935) (covenant not to compete signed eighteen months after defendant began working for plaintiff as at-will employee “was not void for lack of consideration” because “it implied ... a promise on the part of the plaintiff to employ the defendant” thereafter); accord Sherman v. Pfefferkorn, 241 Mass. 468, 473 (1922); see also Smith v. Graham Refrigeration Products Co., Inc., 333 Mass. 181, 186 (1955) (agreement to forego salary until employer’s financial condition improved); Horner v. Boston Edison Co., 45 Mass.App.Ct. 139, 143 (1998) (release of claims). Since Hohenstein was employed at will by Fluke, his employer “ ’’could modify [the] terms [of employment] or ‘terminate . . . (the employment] at any time for any reason or for no reason at all,’ with limited exceptions, such as public policy considerations." York v. Zurich Scudder Investments, Inc., 66 Mass.App.Ct. 610, 614 (2006) (enforcing change of incentive compensation terms for sales person employed at will), quoting Gram v. Liberty Mut Ins. Co., 384 Mass. 659, 668 n.6 (1931).
Hohenstein cannot avoid his obligations under the 2011 Agreement on the ground that his employment relationship with Danaher’s subsidiary changed materially over the next several years. Hohenstein has demonstrated that after signing the non-competition agreement he was promoted from sales engineer to senior systems engineer, he assumed additional responsibilities, and his salary increased by a third. The Court is not convinced that the nature of Hohenstein’s duties changed so fundamentally that his prior employment relationship with Danaher was effectively terminated and as a result the prior non-competition agreement could not be enforced unless it is expressly renewed by the parties. See F.A. Bartlett Tree Co. v. Barrington, 353 Mass. 585, 586-87 (1968). In any case, Hohenstein expressly agreed in his written contract “that any change in my position or title with the Company shall not cause this Agreement to terminate and shall not effect any change in my obligations under this Agreement.” Hohenstein is bound by that stipulation.
Danaher’s assignment of its contractual rights to NetScout is valid even though Hohenstein never consented to it. In his contract, Hohenstein agreed that such an assignment by Danaher “may be done without my consent.” He also agreed that if Danaher assigned its rights under the contract then “this Agreement shall remain binding upon me.” Having waived by contract any right to veto or need to consent to an assignment of Danaher’s rights under the 2011 Agreement, Hohenstein cannot now challenge NetScout’s legal authority to act as Danaher’s assignee.
Hohenstein complains that he is the first former Fluke employee that NetScout has sued for violating his non-competition agreement, even though at least two other former Fluke employees who then worked for NetScout went on to work for competitors of NetS-cout. But he cites no authority and identifies no legal principle suggesting that as a result NetScout is legally barred from enforcing its rights against Hohenstein as Danaher’s assignee.
3.2. Scope and Duration of the Non-Competition Obligations
Although NetScout is entitled to enforce Hohenstein’s obligations under his non-competition agreement with Danaher that does not mean that NetScout has any right to bar Hohenstein from working for a competitor of NetScout.
The non-competition provisions in the 2011 Agreement barred Hohenstein from soliciting potential customers to purchase and from offering, providing, or selling any products or services that are “competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company.” These restrictions applied so long as Hohenst-ein was employed by “the Company, and for a period of 12 months thereafter.” As noted above, “the Company” was defined in the contract to mean “Danaher Corporation including its subsidiaries and/or affiliates,” but did not include its assignees. NetScout is not and never was a subsidiary or affiliate of Danaher.
*152 Since Hohenstein’s non-competition agreement only barred him from competing with Danaher, or with Danaher’s subsidiaries and affiliates, Danaher had no contractual right to bar Hohenstein from working for a company that instead competes with NetScout. As a result, NetScout cannot do so either in its capacity as Danaher’s assignee. “[A]n assignee of contract rights must stand in the shoes of the assignor and has no greater rights than the assignor.” Unisys Fin. Corp. v. Allan R. Hackel Org., Inc., 42 Mass.App.Ct. 275, 281 (1997); accord, e.g., Ford Motor Credit Co. v. Morgan, 404 Mass. 537, 545 (1989). NetScout has presented no evidence that Riverbed, Hohenstein’s new employer, competes with Danaher.
In any case, Hohenstein’s obligations under the disputed provisions of the 2011 Agreement expired by their terms twelve months after Hohenstein stopped working for any Danaher subsidiary. Hohenstein’s employment by any Danaher company ended on July 14, 2015, when he became an employee of NetScout. His obligations not to compete with Danaher therefore expired one year later, on July 14, 2016. Since Hohenstein did not stop working for NetScout until January 2017, the non-competition provisions of Hohenstein’s contract with Danaher had already expired. This is an independent reason why they cannot be enforced by NetScout.
NetScout correctly notes that Hohenstein agreed that his obligations under the 2011 Agreement would continue and not terminate merely because of a change in his position or title with “the Company,” meaning Danaher and its subsidiaries and affiliates. But this does not help NetScout prove its claims. Hohenstein never agreed that he would remain bound by his non-competition and non-solicitation covenants if a corporate transaction caused him to become employed by a new business that is not a subsidiary or affiliate of Danaher and that sells different products and services to different customers. To the contrary, paragraph 20 of the contract states that the Agreement was “intended to benefit each and every subsidiary, affiliate or business unit of the Company.” NetScout, or any other potential future buyer of part of Danaher’s business operations, was not an intended beneficiary of Hohenstein’s non-competition agreement with Dan-aher. Indeed, NetScout makes no claim that it can enforce the contract as a third-party beneficiary. Its only claim is made in its capacity as Danaher’s as-signee.
In sum, the plain language of the 2011 Agreement indicates that NetScout cannot prevail on its claim that Hohenstein has violated the non-competition provisions in that contract.
Even if the 2011 Agreement were ambiguous in this regard, which it is not, that would not mean that NetScout has any likelihood of succeeding on its claim. Any ambiguity in applying the non-competition agreements must be construed “strongly against” NetScout because the contract was drafted by the contracting party (Danaher) that NetScout now contends was representing its future interests. See Leblanc v. Friedman, 438 Mass. 592, 599 n.6 (2003) (ambiguity in written contract must be construed “strongly against the party who drew it” (quoting Bowser v. Chalifour, 334 Mass. 348, 352 (1956)); accord, e.g., Costa v. Brait Builders Corp., 463 Mass. 65, 76 (2012) (where contract “provision is ambiguous, we construe it against the drafter” (citing Restatement (Second) of Contracts §206, at 105 (1981)). This general rule of contract construction applies with full force to employment contracts, perhaps especially those imposing “a post-employment restraint imposed by the employer’s standard form contract.” Sentry Ins. v. Firnstein, 14 Mass.App.Ct. 706, 707 (1982). Under Massachusetts law, such contracts must be “scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood.” Id., quoting Restatement (Second) of Contracts § 188, comment g (1981). Since the Court must construe the relevant contractual provisions “strongly against” Net-Scout, if those provisions were ambiguous the Court would still conclude that NetScout has not shown that it is likely to succeed on the merits of its claim.
ORDER
Plaintiffs motion for a preliminaxy injunction is DENIED IN PART and ALLOWED IN PART. The motion is denied with respect to the provisions of the proposed preliminary injunction that would have barred Defendant from soliciting Plaintiffs customers or attempting to sell products that compete with those of the Plaintiff. The motion is allowed only with respect to the portions of the proposed injunction that Defendant did not oppose.

 See the Form 8-K that NetScout filed with the Securities and Exchange Commission on July 14, 2015, which is available at https://www.sec.gov/Ar-chives/edgar/data/1078075/000119312515253647/d36 264d8k.htm (last visited February 13, 2017). A court may take judicial notice of matters of public record, Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000), including SEC filings that are publicly accessible. See, e.g., Rothman v. Gregor, 220 F. 3d 81, 88 (2d Cir. 2000); Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014); Yates v. Municipal Mortg. & Equity, LLC, 744 F.3d 874, 881 (4th Cir. 2014); Northstar Financial Advisors, Inc. v. Schwab Investments, 779 F.3d 1036, 1043 (9th Cir. 2015); Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276-77 (11th Cir. 1999); see also G.L.c. 23, §76A (authenticated copies of SEC filings are admissible in evidence).